**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Raymond P. Moore**

Civil Action No. 20-cv-03057-RM-STV

JOHN SHEIL,

      Plaintiff,

v.

COMMISSIONER, SOCIAL SECURITY ADMINISTRATION,

      Defendant.

---

### ORDER

---

Plaintiff, John Sheil, brought this case pursuant to Title VII of the Civil Rights Act of 1964, alleging that his employer, Defendant, the Social Security Administration, engaged in unlawful employment practices against him. (ECF No. 1.) Mr. Sheil alleged that Defendant discriminated against him as to the terms and conditions of his employment on the basis of his gender (male) and race (Black). (Id.) He also asserted that Defendant engaged in retaliation against him due to his protected activity. (Id.) Finally, he asserted a claim of a hostile work environment. (Id.)

Defendant filed a Motion for Summary Judgment (ECF No. 42) making several arguments as to why the Court should rule in its favor. Specifically, Defendant asserted that Mr. Sheil did not exhaust his administrative remedies as to several of his allegations, as required under Title VII. (ECF No. 42.) It also argued that Mr. Sheil was not subjected to discrimination on the basis of his race or his sex, nor was he subjected to retaliation or a hostile work environment. (Id.) Mr. Sheil filed a Response (ECF No. 61), and Defendant filed a Reply (ECF

No. 65).  The Motion is ripe for resolution.  Upon review of the Motion and related filings,

relevant parts of the court record, and the applicable statutes and case law, and being otherwise

fully advised, the Court finds and orders as follows.

## I.      BACKGROUND

The following facts are undisputed by the Parties except as specifically noted.

Furthermore, as this is a motion for summary judgment, the Court considers the facts, and draws

inferences, in the light most favorable to the non-moving party, Mr. Sheil.  *United States v.*

*Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Mr. Sheil was hired as an employee of Defendant in 2010 as an attorney and rose to a

position as a Supervisory Attorney Advisor ("Group Supervisor") in 2015.  (ECF No. 66.)  In his

capacity as Group Supervisor, Mr. Sheil had a variety of duties, some of which changed over

time and form the basis of some of his claims.  (Id.)  As part of his duties for at least a portion of

his time as Group Supervisor Mr. Sheil was assigned to oversee attorney advisors and senior

attorney advisors, all of whom wrote decisions for issuance by Defendant's administrative law

judges ("ALJs").  (Id.)  As pertinent here, Mr. Sheil supervised one new attorney, A.S., a white

female, and one senior attorney, C.C., a Black female.  (Id.)  Group Supervisors were also

required to be present to open and close the office on a rotating basis.  (Id.)

Mr. Sheil had a number of supervisors and also interacted with a number of employees

from the Regional Office.  His direct supervisor was Micky Corder.  (Id.)  During the pertinent

period, Mr. Sheil's second line supervisor was Denver Hearing Office Chief ALJ Shane

McGovern.  (Id.)  Mr. Sheil's third line supervisor was then-Acting Regional Chief ALJ Melissa

Santiago.  (Id.[1])  As pertinent here, he also worked with Frank Bobbitt, the Regional Attorney for

---

[1] The Court notes that in his Response to Statement of Undisputed Material Facts and Additional Facts and
Supporting Evidence (ECF No. 60, ¶6), Mr. Sheil purports to dispute this fact.  His factual explanation for the

the Office of Hearings Operations for Defendant's Region VIII (which included the Denver

Hearing Office) and Regional Staff Attorney Deborah Demic, both of whom worked in the

Regional Office.  (Id.)

### A.  Early Allegations

According to Mr. Sheil, the disparate treatment and harassment he experienced began in

2017.  (Id.)  He asserts that he was assigned to close the office more than any of the other

supervisors.  (Id.)  In October of 2017, another employee, a legal assistant, M.L., swore at him

while he was supervising her training of another employee.  (Id.)  Following this incident, Ms.

Corder determined that Mr. Sheil would no longer participate in the training of legal assistants.

(Id.)  Mr. Sheil did continue to provide some training to other employees, although how often he

did so is disputed between the parties.  (Id.)  M.L.'s supervisor spoke with her about the incident.

(Id.)  In early 2018, Ms. Corder removed the supervision of new legal assistants from Mr. Sheil's

responsibilities.  (Id.)

In April of 2018, Mr. Sheil took over the supervision of several attorneys who had

previously been managed by a Group Supervisor who had stepped down from the position.  (Id.)

At that time Mr. Sheil was charged with supervising 14 employees, including all senior

attorneys, attorney advisors, and paralegals.  (Id.)  One of those employees, A.S., was an attorney

advisor.  (Id.)  As her supervisor, Mr. Sheil was charged with granting or denying A.S.'s leave.

(Id.)  A.S. was a new mother, and Mr. Sheil decided to grant her leave without pay, followed by

leave under the Family Medical Leave Act.  (Id.)  Mr. Sheil stated that he believed he was

empowered to grant the leave and that Defendant had encouraged leave-approving officials to

---

dispute, however, is merely that he believes that Judge Santiago's affidavit was completed by Frank Bobbitt, another
employee of Defendant.  (Id.)  That explanation is not responsive to Defendant's statement of fact, and the Court
therefore treats the fact undisputed.

liberally grant leave when possible.  Mr. Bobbitt informed Mr. Sheil that he did not agree with Mr. Sheil's interpretation of Defendant's leave policy.  (Id.)  Mr. Sheil was also confronted by Ms. Demic about his intent to grant A.S. the extended leave.  (Id.)  Mr. Sheil believed that Ms. Demic's confrontation was hostile, rude, and inappropriate, and he expressed that concern to Judge McGovern.  (ECF No. 45-1.)  Nevertheless, Mr. Sheil granted the leave.  (ECF No. 66.)

**B.  Supervision of C.C.**

Mr. Sheil's next difficult interaction occurred over his supervision of C.C.  (Id.)  In May of 2018, Mr. Sheil began to receive a large number of communications from the Regional Office, and in particular Ms. Demic, inquiring about C.C.'s productivity.  (Id.)  The evidence submitted by Mr. Sheil reveals that the Regional Office had been expressing concerns about C.C.'s productivity since before he took over as her supervisor.  (ECF No. 62-15.)  Defendant apparently expected senior attorney advisor decision writers to complete draft orders at a rate of 1 to 1.3 cases per day, while C.C.'s numbers fell well below that guideline.  (Id.)  Despite improvements in C.C.'s numbers, the Regional Office continued to express concerns and began to float the idea that C.C. should be placed on a performance plan.  (ECF Nos. 62-17, 62-18, 62-19, 62-20.)  The Regional Office also expressed concern that Mr. Sheil was assigning C.C. a disproportionate number of easier cases.  (ECF Nos. 62-15, 62-18, 62-19.)  Individuals in the Denver Office, including Mr. Sheil, noted to the Regional Office employees that C.C. was dealing with a number of personal issues and was also taking medical leave.  (ECF Nos. 62-1, 62-17.)  C.C. was also engaged in the process of seeking reasonable accommodations for her health issues.  (ECF No. 62-17.)  Mr. Sheil believed that the Regional Office was discriminating against C.C. by focusing exclusively on her productivity and by seeming to hold her to a standard that did not apply to the other senior attorneys.  (ECF Nos. 45-1, 62-1, 66.)

During the course of the discussions between the Regional Office and the Denver Office regarding C.C.'s performance, Mr. Sheil was involved in at least two phone calls during which he felt that Ms. Demic again yelled at and harassed him.  (ECF No. 66.)  During a call held in January of 2019, Ms. Demic apparently singled out Mr. Sheil for pointed questioning about how he was going to improve C.C.'s performance.  (ECF No. 62-36.)  Ms. Demic raised her voice and was "aggressive and confrontational" with Mr. Sheil.  (Id.)  Others who participated in the call apparently found it uncomfortable to listen to Mr. Sheil being "questioned to this degree" by Ms. Demic.  (Id.)  During a second call, held in February of 2019, Ms. Demic was again confrontational with Mr. Sheil regarding C.C.'s performance.  (Id.)  Ms. Demic noted that C.C.'s numbers had improved between January and February of that year but that she and others in the Regional Office felt "there had to be something else going on" and suggested that Mr. Sheil was assigning C.C. easier cases than he was assigning to the other attorneys under his supervision.  (Id.)  Mr. Sheil responded that he was not assigning C.C. easier cases, that was simply how the assignments happened to come out.  (Id.)  Eventually, Judge McGovern, who was also participating in that call, ended the discussion.  (Id.)  Again, other participants on the call felt that Ms. Demic had been inappropriate and rude to Mr. Sheil.  (Id.)  After each of these phone calls, Mr. Sheil again expressed his concerns to Judge McGovern.  (ECF No.45-1.)

### C.  2018 Performance Assessment

It was in the midst of this period that Mr. Sheil received his 2018 performance review, which he believed was unfairly negative.  (ECF No. 62-1.)  Employees of Defendant are apparently evaluated using a five-point scale, with a "1" score meaning the employee has not been successful in a particular area, a "3" score meaning that the employee successfully contributed, and a "5" score meaning the employee has made an outstanding contribution.  (ECF

No. 62-21.)  During the period both before and after 2018, Mr. Sheil routinely received "5"

scores on some elements.  (ECF Nos. 62-22, 62-23, 62-24, 62-25, 62-26.)  His overall averages

were as follows:

| Year | Average Score | Summary Appraisal |
|------|---------------|-------------------|
| 2015 | 3.7 | Successful Contribution |
| 2016 | 4.3 | Successful Contribution |
| 2017 | 4.7 | Successful Contribution |
| 2018 | 3 | Successful Contribution |
| 2019 | 4.3 | Successful Contribution |
| 2020 | 4.7 | Successful Contribution |

(ECF Nos. 62-1, 62-22, 62-23, 62-24, 62-25, 62-26.)  Mr. Sheil voiced his disagreement with his

appraisal with both Ms. Corder and Judge McGovern.  (ECF No. 45-1.)  He explained his

specific disagreements in a written self-assessment which he also delivered to his two

supervisors.  (Id.)  Mr. Sheil believed that the evaluation had been influenced by people in the

Regional Office.  (Id.)  He also explained that it appeared to give most weight to the few areas in

which he needed to improve without taking into account his successes.  (Id.)  Ms. Corder,

however, declined to change his ratings.  (ECF No. 66.)

### D.  Non-Selection for Colorado Springs Vacancy

Also in December of 2018, Mr. Sheil was not selected for an interview for the position of

Hearing Office Director of the Colorado Springs office.  (Id.)  When that position was open, two

individuals who were not in Mr. Sheil's chain of command, Arlene Quinones and Hearing Office

Chief ALJ Kurt Schuman, reviewed applications and determined who would be interviewed for

the job.  (ECF Nos. 45-9, 45-10[2].)  While Mr. Sheil survived Ms. Quinones's first cut because of his experience as a Group Supervisor, Judge Schuman concluded that he should not be interviewed because his application improperly referred to the position's location.  (Id.)  Judge Schuman stated that "I would not interview John Sheil—he failed to indicate the proper location of the position he was applying for . . . .  Please tell me why I'm wrong if I don't want to waste time interviewing people I already have a problem with due to their lack of attention to detail in an application that should be extremely important to them."  (ECF No. 45-10.)  Then-Acting Regional Chief Administrative Law Judge Melissa Santiago then selected the candidate for the position from among those interviewed, and she chose Shawn Langley, a white man.  (ECF No. 66.)  Mr. Sheil notes that he received interviews for positions in other Regions where he did not have the ongoing disputes with management over alleged discrimination.  (Id.)

**E.  Draft Verbal Counseling Statement**

In February of 2019, one of the employees supervised by Mr. Sheil complained to Ms. Corder regarding an incident involving Mr. Sheil.  (ECF No. 1.)  That employee believed that Mr. Sheil had been rude to her and, apparently, Ms. Corder was sufficiently concerned that she requested that someone from the Regional Office prepare a "draft verbal counseling statement" to be given to Mr. Sheil.  (ECF No. 66.)  Ms. Demic drafted that statement.  (Id.)  According to Ms. Corder, she then inadvertently forwarded the draft statement to Mr. Sheil.  (Id.)  Although Mr. Sheil received the draft, Ms. Corder never formally issued him counseling and no internal investigation was undertaken regarding the incident between Mr. Sheil and the other employee. (Id.)

---

[2] While Mr. Sheil purports to dispute this factual statement, he presents no evidence to contradict the statements provided by Defendant and he makes no substantive argument as to why this statement is incorrect.  The Court therefore treats this fact, and all others similarly "disputed" as, in fact, undisputed.

### F.  Reassignment of Duties

Mr. Sheil asserts that his responsibilities were altered on a number of occasions and suggests that those actions were either discriminatory or taken in retaliation for his engagement in protected activity.  (ECF No. 1.)

In addition to the removal of legal assistants from his supervision in early 2018 (see above), Mr. Sheil notes that in August of 2018 some of the decision writers who were then under Mr. Sheil's supervision were removed and placed under the supervision of a different Group Supervisor who was newly hired.  (ECF No. 66.)  Ms. Corder stated that she made that move because the newly-hired Group Supervisor was in need of work and, in any event, the number of decision writers employed at that time had grown to be too many for any one person to supervise.  (Id.)

In late 2018, Mr. Sheil apparently concluded that a decision writer under his supervision, who was then a probationary employee, should be terminated.  (Id.)  Rather than do so, however, Ms. Corder and Mr. Bobbitt arranged to have that employee work with a different Group Supervisor as a mentor.  (Id.)  Ms. Corder stated that she took this step because it was less severe than termination and that it was consistent with Defendant's practices.  (Id.)  After Mr. Sheil concluded that the mentoring had not improved the quality of the employee's work, and he again voiced his conclusion that the employee should be terminated, Ms. Corder apparently reassigned the employee to be supervised by the other Group Supervisor.  (ECF No.1.)

In April of 2019, the task of scheduling was removed from Mr. Sheil's responsibilities. (ECF No. 66.)  Mr. Sheil, who had been in charge of scheduling for several years, notes that he lost this responsibility shortly after he first contacted an Equal Employment Opportunity ("EEO") counselor in January of 2019, the first step in the filing of an EEO complaint.  (Id.)  Ms.

Corder stated that she changed his responsibilities because Mr. Sheil did not agree with the
regional employee in charge on how to implement a new scheduling system.  (Id.)

### G.  Outside Training

In July of 2019, Defendant paid for Mr. Sheil to attend an outside training on
communication.  (Id.)  Mr. Sheil apparently believed that he was being singled out in a negative
way for additional training.  (ECF No. 1.)  He notes that no other Group Supervisor was sent to
attend the training.  (Id.)  Ms. Corder asserted that she did so as a benefit to Mr. Sheil, and that
Mr. Sheil was not required to attend the training.  (ECF No. 66.)  Mr. Sheil argues that he was
not informed of any benefits.  (Id.)

### H.  Procedural Posture

Mr. Sheil contacted an EEO counselor to begin the process of filing an EEO complaint,
in January 2019.  (ECF No. 45-1.)  He raised a number of these issues with the counselor at that
time.  (Id.)  The EEO counselor issued her report on April 13, 2019, at which time Mr. Sheil was
informed of his right to file a formal EEO complaint of discrimination, given that his dispute was
not resolved.  (Id.)  Mr. Sheil filed his formal EEO complaint in May of 2019.  (Id.)  Attached to
his complaint was a spreadsheet on which he listed 19 separate claims of discrimination,
including claims of discrimination on the basis of his race and his sex, claims of hostile work
environment, and claims of retaliation[3].  (Id.)  After a formal investigation was conducted, the
Final Agency Decision ("FAD") was issued on July 15, 2020.  (ECF No. 45-11.)  The Agency
dismissed several of the claims on procedural grounds.  (Id.)  It dismissed a number of claims on
the basis that Mr. Sheil had not timely initiated the EEO complaint process.  (Id.)  Thus, the FAD
concluded that Mr. Sheil's complaints stemming from before November 28, 2018, were untimely

---

[3] The Court will not list each claim or separately address each one, as the scope of Mr. Sheil's claims has been
narrowed following the filing of his Complaint in this case.  (See ECF No. 1.)

and would be dismissed.  (Id.)  The FAD acknowledged, however, that those claims could be considered as part of his overall claim of harassment.  (Id.)

The FAD dismissed Mr. Sheil's complaint of discrimination regarding the failure to respond to his request, and implicit refusal of management, to change his performance review scores on February 3, 2019.  (Id.)  The FAD reached this conclusion because "management's decision not to respond to Complainant's request to change his overall [performance] rating is not an action in which a remedy exists."  (Id.)  More specifically, the FAD explained that Mr. Sheil had not suffered any present harm or loss with respect to a term, condition, or privilege of his employment when he was found to have successfully contributed.  (Id.)

The FAD also dismissed a claim that Mr. Sheil had suffered discrimination when he had not been selected for a promotion in Alpharetta, Georgia because, the FAD explained, Mr. Sheil had admitted he did not believe that decision had been discriminatory.  (Id.)  Finally, the FAD dismissed any claim that Mr. Sheil experienced disparate treatment when he was the subject of an internal investigation because, the FAD concluded, he was not actually subjected to an investigation.  (Id.)

Turning to the merits of Mr. Sheil's remaining claims the FAD first rejected the contention that he was subjected to disparate treatment when he received an overall performance rating of 3 in 2018 and when his workload was modified (i.e. some decision writers were removed from his supervision, and he was assigned to close the office more frequently than other employees).  (Id.)  The FAD concluded that Mr. Sheil had failed to establish a prima facie case that his (relatively) lower performance score, and the changes in his job responsibilities, were the result of sex or race discrimination or that it was retaliatory.  (Id.)  Then, assuming arguendo that he had demonstrated a prima facie case, the FAD concluded that management had articulated

nondiscriminatory reasons for their alleged actions and that Mr. Sheil had failed to rebut those reasons.  (Id.)

The FAD concluded that Mr. Sheil had established a prima facie case of discrimination when he was not selected (and not interviewed for) the Colorado Springs position.  (Id.)  It also concluded that management had articulated non-discriminatory reasons for the decisions and that Mr. Sheil had failed to demonstrate that the stated reasons were pretextual.  (Id.)

Examining all of Mr. Sheil's allegations, the FAD finally concluded that he had failed to state a prima facie case of harassment because he had failed to present evidence that the alleged harassment was based on his race or sex or retaliatory motives and furthermore concluded that the incidents Mr. Sheil had identified were routine workplace interactions that did not rise to the level of severe or pervasive conduct that would establish a hostile work environment.  (Id.)

Based on these conclusions, the FAD concluded that Defendant did not discriminate against Mr. Sheil on the basis of race, sex, or reprisal.  (Id.)  It also informed Mr. Sheil that he could either file an appeal with the Equal Employment Opportunity Commission or he could file a civil action in the U.S. District Court.  (Id.)  Mr. Sheil then filed his Complaint in this case. (ECF No. 1.)  Defendant filed its Motion for Summary Judgment, (ECF No. 42), Mr. Sheil filed a Response (ECF No. 61), and Defendant filed a Reply (ECF No. 65).

## II.      LEGAL STANDARD

### A.  Summary Judgment

Summary judgment is appropriate only if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Gutteridge v. Oklahoma*, 878 F.3d 1233, 1238 (10th Cir. 2018).  Applying this standard requires viewing the facts in the light most favorable to the

nonmoving party and resolving all factual inferences in its favor. *Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 461 (10th Cir. 2013).

Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or is so one–sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986); *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1136 (10th Cir. 2000). "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is there be no genuine issue of material fact." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citation omitted). "The substantive law of the case determines which facts are material." *United States v. Simmons*, 129 F.3d 1386, 1388 (10th Cir. 1997). A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable jury could return a verdict for either party. *Anderson*, 477 U.S. at 248. Purely legal questions can also be resolved on summary judgment. *See Horn v. CSAA General Insurance Co.*, 642 F.Supp.3d 1267, 1268 (D. Colo. 2022).

"The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact and entitlement to judgment as a matter of law." *York v. Safeco Ins. Co. of Am.*, 540 F. Supp. 3d 1049, 1053 (D. Colo. 2021). "In attempting to meet this standard, a movant who does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claim; rather, the movant need simply point out to the Court a lack of evidence for the other party on an essential element of that party's claim." *Id.* at 1053-54. "Once the movant has met its initial burden, the burden then shifts to the nonmoving party to 'set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 1054 (quoting *Anderson*, 477 U.S. at

256).  "The nonmoving party may not simply rest upon its pleadings to satisfy its burden.
Rather, the nonmoving party must 'set forth specific facts that would be admissible in evidence
in the event of trial from which a rational trier of fact could find for the nonmovant.'"  *Id.*
(quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998)).

### B.   Procedural Requirements to Bring Claims Under the Civil Rights Act of 1964

Pursuant to 29 C.F.R. § 1614.105, which provision applies to employees of federal
agencies, "aggrieved persons who believe they have been discriminated against on the basis of
race, color, religion, sex, national origin, age, disability, genetic information; or pregnancy,
childbirth, or related medical conditions must consult a Counselor prior to filing a complaint in
order to try to informally resolve the matter."  Moreover, except in circumstances not pertinent
here, "an aggrieved person must initiate contact with a Counselor within 45 days of the date of
the matter alleged to be discriminatory or, in the case of a personnel action, within 45 days of the
effective date of the action."  29 C.F.R. § 1614.105(a)(1).  While the charge-filing requirements
of this provision are not *jurisdictional*, they are *mandatory* when raised by the employer.  *Fort
Bend County, Texas v. Davis*, 139 S.Ct. 1843, 1850-51.  A failure to timely contact a counselor
constitutes a failure to exhaust administrative remedies.  *Marquez v. Johnson*, 545 F. Appx 735,
738 (10th Cir. 2013).  Furthermore, a claimant is required to file a charge within the appropriate
limitation period as to each discrete act of discrimination or retaliation.  *Id.*  The Court will not
consider individual claims for which administrative remedies have not been exhausted.  *Id.*
However, "an act contributing to the hostile work environment that occurred outside the filing
period 'may be considered to complete the history of acts comprising the hostile environment.'"
*Id.* (quoting *Holmes v. Utah, Dep't of Workforce Servs.*, 483 F.3d 1057, 1063 (10th Cir.2007)).

### C. Discrimination

In Title VII of the Civil Rights Act of 1964, Congress prohibited discrimination by employers on the basis of certain protected characteristics:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin

42 U.S.C. § 2000e-2.  In this case, Mr. Sheil alleges that he faced discrimination on the basis of his race, Black, and his sex, male.  (ECF No. 1.)  The protection of Black people from employment discrimination was at the heart of Congress's intent when it enacted the Civil Rights Act of 1964.  *United Steelworkers of Am., AFL-CIO-CLC v. Weber*, 443 U.S. 193, 202 (1979). Its provisions also protect men from discrimination, not only women.  *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 78 (1998).

A discrimination plaintiff who brings a claim of disparate treatment may oppose summary judgment under the direct and indirect methods of proof.  *Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005) (citation omitted).  Mr. Sheil pursues only the indirect method[4].  (ECF No. 28 at 2-9.)  Because there is no direct evidence of discrimination in this case, the *McDonnell-Douglas* burden-shifting test applies to Mr. Sheil's claim.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see also Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1216 (10th Cir. 2002).  Under *McDonnell-Douglas*, Mr. Sheil must first establish a *prima facie* case of employment discrimination.  411 U.S. at 802.  If Mr. Sheil makes out a

---

[4] Mr. Sheil does not argue that he has direct evidence of discrimination.  (*See generally* ECF No. 61.)  "When a plaintiff only puts forth circumstantial evidence of discrimination, [the Court] evaluate[s] such claims under the [*McDonnell-Douglas*] framework."  *Fischer v. Forestwood Co., Inc.*, 525 F.3d 972, 978 (10th Cir. 2008) (citations omitted).  Mr. Sheil has waived the argument that he has direct evidence of discrimination.  *See Rosewood Servs., Inc. v. Sunflower Diversified Servs., Inc.*, 413 F.3d 1163, 1167 (10th Cir. 2005) (holding that arguments not raised in the district court are waived) (citation omitted).

*prima facie* case, the burden shifts to Defendant to come forward with a legitimate, non-discriminatory basis for its employment decision. *See id*. If Defendant does so, the inference of discrimination drops away, and the burden shifts back to Mr. Sheil. Mr. Sheil, then, must offer evidence to show that either gender or race was a determinative factor in the employment decision or that Defendant's non-discriminatory reason was merely pretext. *See id.* at 804.

In this case, Mr. Sheil's claim of discrimination on the basis of his race can be evaluated using the traditional *McDonnell-Douglas* framework.

> *1.* *Prima Facie* Case of Discrimination

To establish a *prima facie* case for discrimination, Mr. Sheil must show: (1) he is a member of a protected class; (2) he suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination. *EEOC v. PVNF, LLC*, 487 F.3d 790, 800 (10th Cir. 2007). In a typical Title VII discrimination case, if a plaintiff can show that similarly situated non-minority employees were treated in a more favorable manner, this gives rise to an inference of discrimination and satisfies a plaintiff's *prima facie* burden. *English v. Colo. Dep't of Corrs.*, 248 F.3d 1002, 1011 (10th Cir. 2001) (citation omitted).

"An '[a]dverse employment action' for purposes of a discrimination claim is limited 'to adverse actions that affect employment or alter the conditions of the workplace.'" *Lucas v. Off. of Colorado State Pub. Def.*, 705 F.App'x 700, 704 (10th Cir. 2017) (quoting *Piercy v. Maketa*, 480 F.3d 1192, 1203 (10th Cir. 2007)). "These actions involve a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Id.* "A written warning may be an adverse employment action only if it effects a significant change in the

plaintiff's employment status." *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1224 (10th Cir. 2006). Furthermore, in general, "under Tenth Circuit precedent, where, as here, a supervisor gives an employee a performance review that was lower than previous reviews but still within the range of satisfactory, the employee has not suffered an adverse employment action." *Rivera v. Levitt*, 8 F.Supp.2d 1132, 144 (D. Colo. 2000); *see also Meredith v. Beech Aircraft Corp.*, 18 F.3d 890, 896 (10th Cir. 1994) (employee's evaluation, which found she "meets expectations," though lower than previous evaluations, was not an adverse employment action).

### 2.   *Employer's Non-Discriminatory Reason for Action*

Once an employee has made out a prima facie case of discrimination, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the" adverse employment action. *McDonnell Douglas Corp.*, 411 U.S. at 802. "The defendant's burden to articulate a nondiscriminatory reason has been characterized as an 'exceedingly light' one." *Anaeme v. Diagnostek, Inc.*, 164 F.3d 1275, 1279 (10th Cir. 1999) (quoting *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983)). "[T]he employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 257 (1981).

### 3.   *Pretext*

Once the employer presents evidence that the action was taken for a legitimate, non-discriminatory reason, the burden shifts back to the employee. *Paige v. Donovan*, 511 F.App'x 729, 734 (10th Cir. 2013). "To show pretext," a plaintiff "must produce evidence of 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them

unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'" *Argo v. Blue Cross & Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1203 (10th Cir. 2006) (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir.1997)).

Pretext may also be shown by providing direct evidence discrediting the proffered rational, or by showing that the plaintiff was treated differently from others similarly situated. *Id*. But "mere conjecture that [an] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." *Santana v. City & Cnty. of Denver*, 488 F.3d 860, 864-65 (10th Cir. 2007) (internal quotation omitted). In considering pretext, the "relevant inquiry is not whether [the employer's] proffered reasons were wise, fair or correct, but whether [the employer] honestly believed those reasons and acted in good faith upon those beliefs." *Stover v. Martinez*, 382 F.3d 1064, 1076 (10th Cir. 2004) (internal citation omitted). The focus of a Title VII pretext analysis is on the decision-maker's motivation. *Zisumbo v. Ogden Regional Medical Center*, 801 F.3d 1185, 1200 (10th Cir. 2015) (citing *Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1144 (10th Cir. 2009)).

### 4. *Reverse Discrimination*

Mr. Sheil's claim that Defendant discriminated against him based on his gender, male, falls into the category of a "reverse discrimination claim." (*See* ECF No. 1.) In a reverse-discrimination case, the Tenth Circuit has modified the *McDonnell-Douglas* burden shifting analysis because the plaintiff is not a member of a historically discriminated against group. *Notari v. Denver Water Dep't*, 971 F.2d 585, 589 (10th Cir. 1992). Here, Mr. Sheil is not a member a historically discriminated against group with regard to his gender. Rather, Mr. Sheil is male. Thus, the Tenth Circuit instructs that Mr. Sheil's burden to establish a *prima facie* case "requires a stronger showing." *Argo*, 452 F.3d at 1201 (citing *Notari*, 971 F.2d at 589). In a

reverse-discrimination claim, the first element of establishing a *prima facie* case is modified and the plaintiff "must, in lieu of showing that he belongs to a protected group, establish background circumstances that support an inference that the defendant is one of those unusual employers who discriminates against the majority." *Argo*, 452 F.3d at 1201 (quoting *Notari*, 971 F.2d at 589).  If the plaintiff can make this showing along with the other *prima facie* elements, the remaining elements of the *McDonnell-Douglas* burden-shifting method are applied which allow for the defendant to provide a legitimate, non-discriminatory reason for its action which then shifts the burden to the plaintiff to establish that the proffered reason is merely a pretext for discrimination. *Mattioda v. White*, 323 F.3d 1288, 1291-93 (10th Cir. 2003).

Alternatively, in a reverse-discrimination claim a plaintiff can demonstrate discrimination without reliance on the modified *McDonnell-Douglas* analysis by presenting either direct or indirect evidence sufficient "to support a reasonable inference that but for plaintiff's status the challenged decision would not have occurred." *Notari*, 971 F.2d at 590.

### D.  Hostile Work Environment

"In determining whether an actionable hostile work environment existed," courts look to all the circumstances, "to see if the workplace was 'permeated with discriminatory intimidation, ridicule, and insult . . . sufficiently severe or pervasive to alter the conditions of the [plaintiff's] employment,' and if the plaintiff was subjected to this abusive environment because of" his race or gender. *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1169–70 (10th Cir. 2007) (quoting *Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 680 (10th Cir. 2007), alterations original).

To establish this claim a plaintiff must prove: "(1) [the plaintiff] is a member of a protected group; (2) [the plaintiff] was subject to unwelcome harassment; (3) the harassment was based on [the plaintiff's membership in a protected class]; and (4) due to the harassment's

severity or pervasiveness, the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment." *Harsco Corp. v. Renner*, 475 F.3d 1179, 1186 (10th Cir. 2007) (quotation marks, brackets, and citation omitted). "Isolated incidents (unless extremely serious)" will not suffice. *Fassbender v. Correct Care Solutions, LLC*, 890 F.3d 875, 891 (10th Cir. 2018).

In determining whether a hostile work environment exists, the court examines an objective and subject component, asking "whether the plaintiff was offended by the work environment and whether a reasonable person would likewise be offended." *Hernandez v. Valley View Hosp. Ass'n,* 684 F.3d 950 (10th Cir. 2012) (quotation marks and citation omitted). The plaintiff must prove both. *Id.*

In assessing the objective severity of the harassment, the court considers "such factors as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. . . . The severity and pervasiveness evaluation of a hostile work environment claim is particularly unsuited for summary judgment because it is quintessentially a question of fact." *Id.* (quotation marks, citations, and brackets omitted); *see also Morris v. City of Colo. Springs*, 666 F.3d 654, 664 (10th Cir. 2012) (same). The "objective inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target. . . . Conduct which is considered normal and appropriate in one setting may be deemed abusive or hostile in another." *Morris*, 666 F.3d at 664 (quotation marks and citation omitted).

As for subjective severity, "'if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment,

and there is no Title VII violation.'"  *Morris*, 666 F.3d at 665 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993)).  The employee, however, need not "show that the discriminatorily abusive work environment seriously affected her psychological well-being or that it tangibly impaired her work performance."  *Morris*, 666 F.3d at 665 (quotation marks and citation omitted).

Where an employee is allegedly harassed by a co-worker rather than a supervisor, an employer is liable for the co-worker's sexual harassment "'if the employer was negligent with respect to the offensive behavior.'"  *Kramer v. Wasatch County Sheriff's Office*, 743 F.3d 726, 737 (10th Cir. 2014) (quoting *Vance v. Ball State Univ.*, 570 U.S. 421, 427 (2013)).  This requires a plaintiff to show the employer "had actual or constructive notice of the harassment and negligently failed to remedy or prevent it."  *Kramer*, 743 F.3d at 755.  Constructive notice may be found where there is pervasive harassment, but "only when the incidents are 'so egregious, numerous, and concentrated as to add up to a campaign of harassment that the employer will be culpable for failure to discover what is going on.'"  *Kramer,* 743 F.3d at 757 (quoting *Baker v. Weyerhaeuser Co.*, 903 F.2d 1342, 1346 (10th Cir. 1990)).  "[T]he level of pervasiveness[, however,] must exceed that required to make out a prima facie hostile workplace case and the plaintiff must point to specific facts to support such a finding of pervasiveness-plus."  *Kramer*, 743 F.3d at 757.  And "[a]n 'employer's liability for allowing a . . . hostile work environment after it is reported to the employer by the employee arises only if the employer fails to take adequate remedial and preventative responses to any actually or constructively known harassment.'"  *Bertsch v. Overstock.com*, 684 F.3d 1023, 1028 (10th Cir. 2012) (quoting *Holmes v. Utah, Dep't. of Workforce Servs.*, 483 F.3d 1057, 1069 (10th Cir. 2007)); *Carrera v. Tyson Foods, Inc.*, 449 F. App'x 753, 754 (10th Cir. 2011) (employer absolved of liability "if it takes

remedial and preventative action reasonably calculated to end the harassment" (quotation marks and citation omitted)). A "stoppage of the harassment by the disciplined perpetrator evidences effectiveness." *Bertsch*, 684 F.3d at 1028 (quotation marks and citation omitted).

### E. Retaliation

To establish a prima facie case of retaliation under Title VII, "a plaintiff must show (1) that plaintiff engaged in protected activity; (2) that a reasonable employee would have found the challenged employment action materially adverse; and (3) that there is a causal connection between the protected activity and the materially adverse employment action." *McGowan v. City of Eufala*, 472 F.3d 736, 741 (10th Cir. 2006).

In the context of a retaliation claim, the phrase "adverse employment action" is interpreted more liberally than in the context of discrimination claims. *Lucas*, 705 F.App'x at 704-05; *see also Annett v. University of Kansas*, 371 F.3d 1233, 1239 (10th Cir. 2004) (noting, in the context of a retaliation claim, that "adverse employment action" is liberally defined and includes not only monetary losses in the form of wages or benefits, but also acts that carry a significant risk of humiliation, damage to reputation, and harm to future employment prospects).

To prove a causal connection, a plaintiff must "'present evidence of circumstances that justify an inference of retaliatory motive.'" *Bekkem v. Wilkie*, 915 F.3d 1258, 1271 (10th Cir. 2019) (quoting *Ward v. Jewell*, 772 F.3d 1199, 1203 (10th Cir. 2014)). A causal connection may be inferred if the protected conduct is closely followed by the adverse action. *Id.* If the gap is too long to support an inference of causation on its own, a plaintiff must present other evidence to establish causation. *Id.*

Once a plaintiff establishes such a prima facie case, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action. *McGowan*,

472 F.3d at 741.  If the employer does so, the plaintiff must show pretext.  *Id.*  Unlike evaluating a plaintiff's prima facie case, temporal proximity alone is insufficient to establish, or raise a genuine issue of material fact concerning, pretext.  *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 976 (10th Cir. 2017).  On the contrary, "'temporal proximity can support a finding of pretext only in combination with other evidence of pretext.'"  *Id.* (quoting *Lobato v. N.M. Env't Dep't,* 733 F.3d 1283, 1293 (10th Cir. 2013)).  In measuring temporal proximity, the Tenth Circuit has instructed that time is measured from the date the employee files or asserts, either formally or informally, his complaint of discrimination.  *Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1209 (10th Cir. 2007).  The Tenth Circuit has also instructed that four months between the protected activity and the adverse employment action is too long to infer a causal connection.  *Proctor*, 502 F.3d at 1208.  "If there is reason to believe the employer's reasons are pretextual, the case may be submitted to the jury."  *McGowan*, 472 F.3d at 741.

### III.   ANALYSIS

#### A.  Untimely Claims

As an initial matter, the Court agrees with Defendant that Mr. Sheil's claims for discrimination that allegedly took place before the end of November of 2018 are barred based on his failure to timely contact a counselor and exhaust his administrative remedies.  Those incidents cannot form the basis of individual claims of discrimination, but the Court will consider them when evaluating Mr. Sheil's claim of hostile work environment.

Mr. Sheil's barred claims include his complaints about the incident with M.L., who swore at him during a training session in October of 2017.  (ECF No. 1.)  The subsequent decision to alter Mr. Sheil's training responsibilities also took place at that time.  (Id.)  The decision to remove the legal assistants from Mr. Sheil's supervision took place in early 2018.  (Id.)  The

disputes and discussions surrounding his decision to grant leave to A.S. took place in April and May of 2018.  (Id.)  And the decision to reassign some of the decision writers from his supervision to that of the newly-hired Group Supervisor took place in August of 2018.  Because Mr. Sheil failed to exhaust his administrative remedies as to those claims, the Court concludes that they must be dismissed.

### B.  Discrimination

Mr. Sheil has made a number of allegations that he was the victim of discrimination on the bases of his race and sex.  The Court considers each in turn.

### 1.  *Supervision of C.C. and Related Phone Calls with Regional Office*

While some of the incidents related to Mr. Sheil's supervision of C.C. took place outside of the applicable time window—before late November 2018—the Court will assume without finding that Mr. Sheil properly exhausted his administrative remedies as to this claim.

As prima facie evidence that he suffered discrimination during his supervision of C.C., Mr. Sheil points to the phone calls during which he experienced hostility from Ms. Demic[5]. (ECF No. 1.)  He points out that he is a member of a protected class in that he is Black.  (Id.)  He states that he suffered adverse employment actions in several respects.  (Id.)  First, he states that Ms. Demic "continued her efforts in micromanaging all of [Mr. Sheil's] actions and interjecting herself into making decisions which would affect the terms and conditions of his employment with Defendant."  (Id.)  Second, he points out that during the phone calls, Ms. Demic was rude, hostile, and inappropriate and that she would not let him speak but rather kept cutting him off. (Id.)  Third, Mr. Sheil contends, without explanation, that "[t]he degradation of [C.C.] was an effort to ruin his future employment with Defendant."  (Id.)

---

[5] Mr. Sheil also argues that he was also subject to retaliation because he told management that he believed they were discriminating against C.C.  (ECF No. 1.)  That portion of Mr. Sheil's argument will be addressed separately.

The Court concludes that Mr. Sheil failed to meet his burden to establish a prima facie case of discrimination on the basis of his race or his sex with regard to these incidents because he has not demonstrated that he was subjected to an adverse employment action sufficient to meet that definition in the context of a claim of discrimination.  An adverse employment action in this context involves "a '*significant* change in employment status."  *Lucas* 705 F.App'x at 704 (quoting *Piercy*, 480 F.3d at 1203).  Rudeness during meetings, unless sufficiently severe, does not rise to the level of an adverse employment action.  *See Paige*, 2011 WL 5520291 at *17 (plaintiff's receipt of "curt or rude" email could not raise an adverse employment action); *Somoza v. Univ. of Denver*, No. 05-cv-00355-PAC-BNB, 2006 WL 2535092, at **8, 11 (D. Colo. Aug. 31, 2006) (although the record showed coworker treated plaintiffs rudely and with disrespect, and were mean and unprofessional, the treatment did not "rise to a level of conduct that affected the terms and conditions of the plaintiffs' employment.").

In addition, the Court notes that in order to establish a prima facie case of discrimination, Mr. Sheil bore the burden of offering some evidence that would allow a reasonable fact finder to conclude that the conduct took place under circumstances giving rise to an inference of discrimination on the basis of his race or his sex.  *PVNF, LLC*, 487 F.3d at 800.  In this case, other than Mr. Sheil's apparent suspicion that Ms. Demic behaved as she did for discriminatory reasons, he presents no evidence whatsoever to support that conclusion.  The Court concludes that Mr. Sheil's complaints about his treatment during his supervision of C.C. cannot support his claim of discrimination.

### 2.   *2018 Performance Score*

Mr. Sheil argues that, by giving him an overall score of 3 in 2018, although he had received much higher scores the years before and after, Defendant again discriminated against

him.

First, as to his claim of sex discrimination the Court concludes that Mr. Sheil has made no showing—and in fact has not even alleged—that his performance score was issued in "circumstances that support an inference that the defendant is one of those unusual employers who discriminates against the majority." *Notari*, 971 F.2d at 589. Thus, the Court concludes that Mr. Sheil failed to establish a prima facie case of sex discrimination.

With regard to discrimination based on race, however, once again there is no dispute that Mr. Sheil has demonstrated that he is a member of a protected class because of his race. The Court next must consider whether Mr. Sheil presented adequate evidence that he suffered an adverse employment action.

As previously noted, precedent in this circuit suggests that, when the performance score falls within the satisfactory range, the mere fact that it is a lower performance score than in previous years is not sufficient to demonstrate an adverse employment action. *See Rivera*, 8 F.Supp.2d at 1144; *Meredith*, 18 F.3d at 896. Mr. Sheil points out that the reduction in his score made him ineligible for certain monetary bonuses, however. (ECF No. 1.) The Court will assume, therefore, that Mr. Sheil has met his burden on this point. Similarly, the Court will assume, without finding, that Mr. Sheil demonstrated that his reduction in his performance review score occurred under a circumstance giving rise to an inference of racial discrimination.

The Court then turns to Defendant's explanation for why his score was reduced to consider whether it has presented sufficient evidence that the reason was not discriminatory. Defendant asserts that Mr. Sheil's score of "3" was based on a comprehensive assessment of his performance during the prior year. (ECF No. 42.) Specifically, Ms. Corder explained her ratings in the body of Mr. Sheil's performance review. (ECF No. 45-1.) Among her critiques were her

observations that (1) Mr. Sheil was not always dependable to complete assignments without reminders; (2) he had been late to several meetings; (3) he arrived late when he was assigned to open the office and when he had scheduled a training with new hires first thing in the morning; (4) he had not shared certain automation tools he had discovered to streamline decision writing with the other decision writers; (5) his task list was "out of control" with 426 items on his "to dos"; (6) sometimes he did not expedite appropriate cases; (7) he did not always assign cases equitably among the decision writers; (8) they were "not achieving appropriate results in the area of fees"; (9) he did not always keep her involved with what was happening with the decision writers; and (10) he had not made meeting with his subordinates, including schedulers and writers, a priority.  (Id.)  Contrary to Mr. Sheil's contention, however, Ms. Corder also noted several of his strengths in the review, including that (1) he treated others with kindness, courtesy, and respect; (2) he remained positive and productive and he had good intentions; (3) he cared about the success of his coworkers; (4) he made positive contributions regarding the use of new technology, including creating a new report for supervisors to monitor workloads; (5) he was always looking for solutions to problems and new ways to do things; (6) he had learned the job of scheduling supervisor "inside and out" and had made the job of schedulers more streamlined; (7) he did a great job getting the scheduling unit "on board and ahead with scheduling"; (8) he had strong abilities to mentor, coach, and empower his employees; (9) he identified issues with the scheduling process and came up with solutions, which he then shared nationally; and (10) he instituted a "weekly huddle" with the schedulers which had been very productive and successful. (Id.)  The Court concludes that Defendant more than met its light burden of offering a non-discriminatory reason for Mr. Sheil's performance rating in this case.

The Court then looks to Mr. Sheil to offer evidence that the explanation offered by

Defendant was pretextual.  In response to his performance review, Mr. Sheil prepared a self-evaluation in which he listed his 2018 work accomplishments that he believed Ms. Corder had overlooked.  (ECF No. 45-1.)  In his assessment, Mr. Sheil provided a number of examples of his successes that, in fact, mirrored the positive feedback provided by Ms. Corder.  For example, he noted that he "maintained a positive and encouraging attitude towards working to help the office," and that he had a positive relationship with decision writers under his supervision.  (Id.) He pointed out that he had spoken with employees in a "positive and encouraging manner" when they were faced with an intimidating task.  (Id.)  He noted that he had instituted scheduling huddles and also acknowledged that when he did not attend, those huddles did not go as well— he pointed out that at that point he immediately started facilitating those meetings again.  (Id.) Mr. Sheil also highlighted his successful adaptation and implementation of technology, both within his office and within other offices.  (Id.)  He pointed to numerous instances during which he mentored and coached his coworkers and subordinates.  (Id.)

Mr. Sheil's self-assessment also took issue with some of the critiques listed by Ms. Corder arguing, for example, that his task list was "out of control" because he had taken over for another supervisor and pointing out that he had been promised that some of those to-do items would be reassigned, but that had not yet occurred.  (Id.)  He also listed some specifics not mentioned in his performance reviews, such as noting how he had identified problems with various employees' performance and taken steps to remedy those issues and pointing out that the decision writers had increased their productivity since he had taken over as a Group Supervisor. (Id.)

The Court reiterates, however, that when determining whether an explanation is merely pretext, the Court does not decide whether the employer acted wisely, fairly, or correctly.

*Stover*, 382 F.3d at1076.  Rather, it must determine whether the employer honestly believed the reasons it offers and whether it took action in good faith, relying on those honest beliefs.  *Id.*  Mr. Sheil has offered only his own opinion that his performance review was unfair for the reasons stated in his self-assessment.  But because the inquiry is not ultimately concerned with whether Defendant acted fairly, and instead whether it honestly believed its stated, non-discriminatory reasons, the Court concludes that Mr. Sheil's evidence is insufficient to allow a reasonable trier of fact to decide that Defendant's stated reasons were pretextual cover for racial discrimination.

3.    <u>Non-Selection for Colorado Springs Vacancy</u>

In the specific context of a failure-to-hire claim, in order to make out a prima facie case a plaintiff must show that (1) he or she belongs to a protected class; (2) that he or she applied, and was qualified, for a job for which the employer was seeking applicants; and (3) that, despite his or her qualifications, the employer did not offer him or her the position under circumstances giving rise to an inference of unlawful discrimination.  *Burdine*, 450 U.S. at 253-54.  If, however, the decisionmaker was not aware of the plaintiff's race, then the plaintiff cannot establish a prima facie case "because it is impossible to infer that the decision was due to discriminatory intent."  *Owens v. Donahoe*, 913 F.Supp.2d 1055, 1062 (D. Colo. 2012).  In the context of reverse discrimination, a plaintiff must also demonstrate that the background circumstances support an inference that the defendant is the unusual employer that discriminates against, in this case, men.  *Notari*. 971 F.2d at 589.

If the plaintiff can satisfy his or her burden of presenting a prima facie case, "[t]he burden that shifts to the defendant, therefore, is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason."  *Burdine*, 450 U.S. at 254.  The plaintiff then has the opportunity to

demonstrate that the proffered reason was pretextual.  *Id.* at 256.  The plaintiff can do so either

by providing direct evidence that "a discriminatory reason more likely motivated the employer or

indirectly by showing that the employer's proffered explanation is unworthy of credence."  *Id.*

> [T]he employer has discretion to choose among equally qualified candidates,
> provided the decision is not based upon unlawful criteria.  The fact that a court
> may think that the employer misjudged the qualifications of the applicants does
> not in itself expose him to Title VII liability, although this may be probative of
> whether the employer's reasons are pretexts for discrimination.

*Id.* at 259.

As an initial matter, the Court again concludes that Mr. Sheil has failed to even allege

that the background circumstances here support a claim for reverse discrimination against him as

a man.  He offers no evidence that would allow a trier of fact to reach such a conclusion, and he

makes no argument to that effect.  Thus, the Court concludes he has failed to make out a prima

facie case of discrimination on the basis of his sex.

Turning to his claim of racial discrimination, however, the Court reaches a different

conclusion.  First, the Court notes that the Parties do not dispute that Mr. Sheil is a member of a

protected class, that he was qualified for the position, and that he was not offered the position

which was, instead, given to a white employee.  Here, the Parties' first dispute is whether the

individuals involved in hiring for the Colorado Springs position were aware of Mr. Sheil's race.

(ECF Nos. 42, 61, 65.)  Arlene Quinones, a Regional Management Officer who was one of the

people who made the selection of interviewees, states that she was unaware of Mr. Sheil's race

until he filed his complaint in this matter.  (ECF No. 45-9.)  Judge Kurt Schuman, who worked

with Ms. Quinones to choose the individuals to be interviewed, states that he "did not become

aware of Plaintiff's race (and believed he might have been Caucasian) until he filed the instant

EEO complaint in early 2019."  (ECF No. 45-10.)  Judge Schuman worked as the acting-Hearing

Office Chief Administrative Law Judge in the Denver Hearing Office, where Mr. Sheil was employed, during the time Mr. Sheil was employed there and he states that he had observed Mr. Sheil's job performance in that capacity. (Id.) The Court notes that other individuals employed in the Denver Hearing Office indicated that they *were* aware of Mr. Sheil's race, including Ms. Corder who was aware of Mr. Sheil's race through her "role as his direct supervisor." (ECF No. 45-3.) Hearing Office Chief Administrative Law Judge Shane McGovern, who was Mr. Sheil's second line supervisor in the Denver Hearing Office indicates that he "became aware" of Mr. Sheil's race and sex the first time they met face-to-face. (ECF No. 45-4.) Mr. Sheil states that he met both Ms. Quinones and Judge Schuman in person a number of times and that therefore they were aware of his race. (ECF No. 61.) Drawing the inferences in Mr. Sheil's favor, as the non-moving party, the Court finds that a reasonable juror could conclude that Mr. Sheil's race was obvious to those with whom he worked. The Court concludes that Mr. Sheil has presented sufficient evidence to demonstrate the existence of a genuine issue of material fact regarding whether those screening candidates for interviews were aware of his race. As noted above, the Parties do not dispute the remaining elements of the prima facie case. The Court concludes, therefore, that Mr. Sheil has made out a prima facie case of discrimination.

Defendant then has the opportunity to provide a non-discriminatory explanation for the decision. Here, Defendant presents evidence that the hiring authorities decided not to interview Mr. Sheil because he had listed the incorrect job location on his application. (ECF No. 45-10.) In addition to the affidavits of Ms. Quinones and Judge Schuman, Defendant has attached copies of Mr. Sheil's application for the position, the email discussion between Ms. Quinones and Judge Schuman, and the application submitted by the successful candidate. In the email exchange, Judge Schuman expressly stated that he did not believe that Mr. Sheil should be interviewed

because "he failed to indicate the proper location of the position he was applying for." (Id.) Judge Schuman added "I don't want to waste time interviewing people I already have a problem with due to their lack of attention to detail in an application that should be extremely important to them." (Id.) Judge Schuman also indicated that another applicant, who did not indicate the correct position on his application, should not be interviewed. (Id.) Because Mr. Sheil was not interviewed for the position, Judge Santiago indicated she did not select him for the position. (ECF No. 45-5.) The Court concludes that these reasons adequately satisfy Defendant's burden to offer a non-discriminatory reason for the decision to select a different individual.

Mr. Sheil does not dispute the authenticity of the documents submitted by Defendant, nor does he deny that he made an error on his application. Instead, he argues that there is evidence that the reason was pretextual because, at the time of the decision, Ms. Demic was serving as the acting head of the Colorado Springs office and "[t]he evidence shows Judge Schuman and Ms. Demic had conversations regarding the applicants prior to the interview process. The record contains inferences of racial [animus] and retaliation from Ms. Demic towards Plaintiff." (ECF No. 61.) In support of these statements, Mr. Sheil seems to cite Ms. Corder's investigation affidavit (ECF No. 62-2.) The cited portion, however, does not support his statement of facts, it merely acknowledges that he and Ms. Demic had at least two conversations during phone calls, that Mr. Sheil took issue with Ms. Demic's behavior on those calls, and that Ms. Corder reported the situation "up the chain." (Id.) Mr. Sheil calls the "rating committee" "a sham" because, according to him, Judge Schuman ultimately made the decision about who would be interviewed and recommended for the position by himself. (ECF No. 61.) But Mr. Sheil does not explain why that would render the process a "sham," and the evidence clearly demonstrates that Ms. Quinones consulted with Judge Schuman about the decisions. (ECF No. 45-10.)

Mr. Sheil also argues, however, that Defendant's justification for why he was not selected has been "inconsistent and changing." (ECF No. 61.) The Court does not necessarily see any inconsistency between Judge Schuman's statement that Mr. Sheil failed to show attention to detail in his application and his statement that Mr. Sheil was not as qualified as other applicants, many of whom had previously served as acting-Hearing Office Director, ("HOD") which Mr. Sheil had not. (ECF Nos. 45-10; 62-32.) But Mr. Sheil also discredits Defendant's stated rationale by pointing out that other applicants also made errors on their applications, including one who misspelled Judge Schuman's name, one who failed to note the number of employees he had previously supervised, and one who listed the vacancy as in the "Colorado" hearing office, yet all received interviews. (ECF No. 61.) Defendant included one of those applications, that of the candidate ultimately selected for the position. (ECF No. 45-10.) That candidate did, in fact, misspell Judge Schuman's name, incorrectly spelling it with a second "n." (Id.)

The Court would be inclined to find no genuine issue of material fact had that been the only inconsistency in Defendant's explanation for its decision. However, Judge Schuman stated more than once that the applicant ultimately selected had previously served as the acting-HOD and that he was therefore more qualified than was Mr. Sheil. (ECF Nos. 45-10; 62-32.) Ms. Quinones, however, makes no reference to such prior experience as an acting-HOD, noting instead that the selected candidate, who had served with Defendant for approximately the same amount of time as Mr. Sheil, had prior experience supervising staff in a solo law practice. (ECF No. 45-9.) Furthermore, the recommendation submitted by Judge Santiago, recommending the candidate who was ultimately selected, likewise made no mention of any prior experience as acting-HOD. (ECF No. 62-31.) And, perhaps most importantly, the successful candidate himself never states he had experience as an acting-HOD in his application for the position.

(ECF No. 45-10.)

Mr. Sheil and the successful candidate have remarkably similar qualifications—Mr. Sheil, in fact, was hired by Defendant in 2010, two years before the successful candidate.  (Id.) Mr. Sheil became an attorney advisor almost a year before the successful candidate did so and Mr. Sheil was elevated to Group Supervisor also almost one year before the successful candidate. (Id.)  It is true that the successful candidate had operated his own private law office for approximately 11 years before he was hired by Defendant, and in that capacity had significant supervisory experience, while Mr. Sheil had only two years running his own law office.  (Id.) But nowhere in the email communications regarding who should or should not be interviewed was that distinction mentioned.  (Id.)  Finally, Judge Schuman asserts in his affidavit that "I did not believe that Plaintiff was nearly as successful as [the successful candidate] as a Group Supervisor, based on my observations when I was working in the Denver Hearing Office as Acting HOCALJ."  (Id.)  But that observation is entirely unsupported by any other evidence in the record, and, in fact, Mr. Sheil's previous performance evaluations showed that he was quite successful in his role as Group Supervisor.  (ECF Nos. 62-22; 62-23; 62-24.)

Drawing all reasonable inferences in favor of Mr. Sheil, as the Court must, it concludes that a reasonable jury could conclude that the reasons offered by Defendant for its choice not to interview Mr. Sheil for the Colorado Springs position were pretextual.  Thus, Mr. Sheil has presented a genuine issue of material fact as to this claim of racial discrimination.

### 4. _Draft Verbal Counseling Statement_

With regard to the draft verbal counseling statement, the Court again concludes that Mr. Sheil has failed to set out any facts that would allow a jury to conclude that Defendant is the unusual employer that discriminates against the majority group, in this case men.  Thus, he has

not satisfied his burden to make out a prima facie case of gender discrimination.

With regard to the question of race discrimination, the Parties contend (and the Court agrees) that the critical question is whether Mr. Sheil's receipt of the draft verbal counseling statement constitutes an adverse employment action. (ECF Nos. 42, 61.) Defendant notes that he never received formal verbal counseling—that is, the draft statement was never issued. (ECF Nos. 45, 65.) Nor, Defendant notes, was any internal investigation conducted as a result of the draft statement. (ECF No. 45.)

Mr. Sheil argues, however, that the draft statement demonstrates that the Regional Office "was attempting to place [him] on a performance plan at the time." (ECF No. 61.) Furthermore, he asserts that the draft statement "undermined his position as a supervisor since the reprimand was based on [his] attempting to correct one of his employee's work product." (Id.) He contends that his authority to manage his employees was undermined by the draft statement. (Id.)

The Court notes that Mr. Sheil presents no evidence that he was ever placed on a performance improvement plan. He also offers no information suggesting that any of his subordinate employees were ever aware that the draft statement had been composed. He does not explain how, in the absence of such disclosure, his authority over his employees would be undermined. He likewise fails to explain in what way his receipt of the draft statement affected his authority to manage his employees—he does not support any claim that his receipt of the statement adversely affected the terms and conditions of his employment. In fact, other than the understandable distress he experienced from reading a drafted reprimand he does not present any evidence that the draft statement made any significant and negative impact on his job. The Court concludes, therefore, that Mr. Sheil has failed to state a prima facie case of discrimination

regarding the draft verbal counseling statement as to either gender or race.

    5.  *Conclusion*

For the reasons set forth above, the Court concludes that Mr. Sheil has failed to demonstrate a genuine issue of material fact as to his claim of discrimination on the basis of his gender. Therefore, the Court GRANTS Defendant's Motion for Summary Judgment with regard to Mr. Sheil's first claim for relief. The Court also concludes, however, that Mr. Sheil has presented a genuine issue of material fact with regard to his claim for racial discrimination in the decision not to hire him for the Colorado Springs vacancy but has failed to do so with regard to the other incidents he lists. The Court therefore GRANTS IN PART and DENIES IN PART Defendant's Motion for Summary Judgment with respect to Mr. Sheil's second claim for relief.

## C.  Hostile Work Environment

In order to state a claim for being subjected to a hostile work environment, Mr. Sheil must present evidence that he was subjected to unwelcome harassment, which harassment was based on his membership in a protected class, and that as a result of its severity and pervasiveness, the harassment altered a term, condition, or privilege of his employment and created an abusive working environment. *Renner*, 475 F.3d at 1186.

Once again, it is undisputed that Mr. Sheil is a member of a protected class because he is Black. The Court also concludes that Mr. Sheil has presented sufficient evidence to permit a fact finder to conclude that he was subjected to unwelcome harassment. Specifically, the antagonistic relationship that developed between Mr. Sheil and the employees of the Regional Office, namely Ms. Demic and Mr. Bobbitt, clearly caused Mr. Sheil significant distress. He complained specifically about Ms. Demic's behavior on at least three occasions. The evidence he presented demonstrates that Mr. Bobbitt and Ms. Demic disagreed with the decisions he made

during his supervision of A.S. and C.C. and that they were quite aggressive in making that known to Mr. Sheil.  Mr. Sheil also appears to argue that he experienced "harassment" in the form of his lower performance score and being denied the position in the Colorado Springs office.  (ECF No. 61.)

Mr. Sheil must also demonstrate, however, that he suffered such harassment *because of* his race or his gender.  *Montes*, 497 F.3d at 1169-70.  Of this element, the Court finds no evidence.  While Ms. Demic appears to have been rude to Mr. Sheil, there is no indication that she was rude to him *because* he was Black or male.  He presents the Court with no evidence at all that Ms. Corder gave him lower performance scores because of his race or gender.  While the Court previously concluded that there is sufficient evidence to present a genuine issue of material fact as to whether Mr. Sheil was denied the position in Colorado Springs on the basis of his race, the Court does not find that single incident sufficient to create such a pervasive atmosphere of discrimination and such an abusive environment as to constitute a hostile work environment.  The Court also reiterates that "[i]solated incidents (unless extremely serious)" will not establish a hostile work environment.  *Fassbender*, 890 F.3d at 891.

Mr. Sheil has pointed to a number of such isolated incidents but has not offered evidence that any of those incidents were "extremely serious" or based on his membership in a protected class.  In reaching this conclusion, the Court has considered each of the following incidents:

- In October of 2017an employee, M.L., swore at Mr. Sheil.  Her supervisor later spoke with her about the incident.

- After the incident involving M.L., Ms. Corder removed training new employees from his purview.  He concedes that he has continued to provide some training.

- In early 2018 the supervision of legal assistants was reassigned, according to Mr.

Sheil because one of the legal assistants complained about him.

- In early 2018, Mr. Sheil experienced the contentious exchanges regarding his decision to grant leave to A.S.

- Starting in early 2018, after he took over as her supervisor, Mr. Sheil began to receive communications regarding C.C.'s performance, which communications culminated in the three hostile exchanges with Ms. Demic in late 2018 and early 2019.

- In April of 2018, Ms. Corder removed some of the decision writers from Mr. Sheil's supervision and placed them under the supervision of a newly hired Group Supervisor, although Mr. Sheil retained supervision over about half of the writers.

- In late 2018 Mr. Sheil received his performance review and received a lower score than he had in previous years, although he was still rated as a successful contributor.

- In December of 2018, he was not selected for the Colorado Springs position.

- In February of 2019, he was accidentally sent a copy of a draft verbal counseling statement prepared after another employee under his supervision complained about him to management.

- In April of 2019, Ms. Corder placed a different employee in charge of the task of scheduling.

- In July of 2019, Ms. Corder offered to send Mr. Sheil to an outside communications training.

The Court has previously concluded that Mr. Sheil has not presented evidence that most of these incidents were in any way related to his membership in a protected class. The Court

also does not consider this list of events to be the sort of "discriminatory intimidation, ridicule, and insult" contemplated by the hostile work environment caselaw.  As the FAD concluded, the Court finds the incidents are mostly routine workplace interactions.  Thus, the Court concludes that Mr. Sheil has failed to present a genuine issue of material fact with regard to his claim of hostile work environment and the Court GRANTS Defendant's Motion for Summary Judgment as to his third claim.

### D.  Retaliation

Mr. Sheil's final claim is for retaliation.  As previously noted, Mr. Sheil must first present evidence that he engaged in a protected activity.  In this case, he contends, and Defendant does not appear to dispute, that he engaged in protected activity when he informed his supervisors that he believed that they were discriminating against another Black employee who also suffered from a medical condition, C.C., by holding her to different performance standards than other Senior Attorney Advisors.

The second question is whether Mr. Sheil has presented sufficient evidence to show that a reasonable employee would have found the employment action to be materially adverse.  Noting that the standard in the context of a claim for retaliation is more liberal than that in a claim for discrimination, the Court again concludes that Mr. Sheil has met his burden.  Among the employment actions that a reasonable employee would have considered adverse were the lower score on his performance review, the decision not to offer him an interview for the Colorado Springs position, the hostile interactions with the Regional Office regarding his supervision of C.C., and the decision to remove certain responsibilities from his charge.  Those actions, separately perhaps, but certainly together, could dissuade an employee from engaging in the protected activity.  *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

Mr. Sheil must then demonstrate that the materially adverse employment actions were causally connected to his protected activity. In this case, Mr. Sheil engaged in the protected activity repeatedly over time, raising the question of discrimination against C.C. as early as May of 2018. (ECF No. 45-4.) Mr. Sheil addressed his concerns in writing to Judge McGovern in January of 2019. (ECF No. 45-1.) He noted that Mr. Bobbitt had mentioned C.C.'s pending EEO complaint during a call to discuss her performance and also pointed out that in his view the Regional Office was holding C.C. "to different standards than the other [Senior Attorney Advisors], which could be considered discriminatory." (Id.) The employment actions took place throughout this time, some of them in close temporal proximity. The Court concludes, therefore, that Mr. Sheil has made out a prima facie case that he was subjected to retaliation due to his engaging in protected activity.

The burden then shifts to Defendant to articulate a legitimate, non-retaliatory reason for the adverse employment actions. *McGowan*, 472 F.3d at 741. For some of these adverse employment actions, the Court has already discussed Defendant's proffered explanations. The Court again finds that Defendant adequately offered explanations for Mr. Sheil's lower performance rating and for the decision not to interview Mr. Sheil for the Colorado Springs position.

Defendant explains the interactions between the Regional Office and Mr. Sheil, related to his supervision of C.C., by explaining that C.C.'s performance was objectively below that of her peers. (ECF No. 45-7.) Ms. Demic asserts that one of her duties is to monitor the productivity of decision writers in the region that includes the Denver office, and it was in that capacity that she was monitoring C.C.'s performance. (Id.) In addition, Ms. Demic notes that she began raising these concerns about C.C. before Mr. Sheil took over as supervisor. (Id.)

But Ms. Demic also concedes that she was using metrics to evaluate C.C. that were "not all" "formal performance standards." (Id.) And Ms. Demic offers no explanation for her rude behavior on the phone calls with Mr. Sheil, which behavior a number of other employees also found to be rude and inappropriate. (ECF Nos. 62-2; 62-36.) Ms. Corder also noted her perception that Ms. Demic "has negative feelings towards [Mr. Sheil] and the January and February 2019 incidents were not isolated events." (ECF No. 62-2.) Ms. Demic asserts that she was not aware of any EEO or other protected activity in which Mr. Sheil had engaged. (ECF No. 45-7.) The record demonstrates, however, that Mr. Sheil raised his concerns about discrimination against C.C. repeatedly with both individuals in his office and in the Regional Office. The Court concludes that Defendant has failed to articulate or offer proof of a legitimate, non-retaliatory reason for the treatment of Mr. Sheil on these phone calls.

Finally, with regard to Mr. Sheil's changing responsibilities, Defendant offers Ms. Corder's statements regarding each change made. She explains that she removed Mr. Sheil from the responsibility for training "because it was more consistent to keep the training with one person," and notes that Mr. Sheil continued to conduct other trainings. (ECF No. 45-3.) She explained that she placed the legal assistants under a different supervisor because the new supervisor had previously only supervised decision writers and she wanted to gain a new experience. (Id.) When she removed several of the decision writers from Mr. Sheil's supervision, she explains, it was because the new supervisor had recently been hired and was in need of work. (Id.) In addition, several new decision writers had been hired and Ms. Corder concluded that "the greater number of writers was now too many for one person to supervise." (Id.) Finally, Ms. Corder explains that she put a different employee in charge of scheduling after a new centralized scheduling system had been adopted because Mr. Sheil did not agree with the

regional employee in charge on how to implement the new system. (Id.) The Court concludes that Defendant has satisfied its burden to articulate non-retaliatory reasons for removing certain responsibilities from Mr. Sheil's desk at different times.

Mr. Sheil, then, has the obligation to come forward to demonstrate that the reasons offered by Defendant are pretextual and that the real reasons for the adverse actions were retaliatory. The Court has already concluded that Mr. Sheil met this burden with regard to the decision not to interview him for the Colorado Springs position. The Court has also now concluded that Defendant did not offer a non-retaliatory explanation for the hostile phone calls with the Regional Office, and therefore Mr. Sheil need not rebut anything with regard to those incidents.

Turning first to Mr. Sheil's performance scores, the Court concludes that Mr. Sheil has not offered any information to rebut Defendant's legitimate explanation. Mr. Sheil states, without record support, that the Regional Office participated in the drafting of his performance review. While Mr. Sheil points the Court to one email from Mr. Bobbitt discussing his wish to put Mr. Sheil on a performance plan, the email itself offers no input on how Ms. Corder should complete the performance review. (ECF No. 62-27.) In fact, the performance review completed by Ms. Corder indicated that Mr. Sheil had been successful in 2018 and ultimately the Regional Office did not succeed in putting him on a performance plan. Mr. Sheil also argues that Ms. Corder failed to follow Defendant's policies regarding evaluations of his performance, suggesting that she did not consider his self-assessment or other factors such as "factors that may be outside the employee's control." (ECF No. 61.) Mr. Sheil has failed, however, to account for the positive and negative feedback that Ms. Corder did include in his review. He does not explain how additional information would have changed his score. And, as previously discussed

above, he does not acknowledge the consistencies between his self-evaluation and the feedback provided by Ms. Corder.  He has provided no evidence, furthermore, that would directly suggest that Ms. Corder harbored a retaliatory motive when she completed his review.  The Court concludes, therefore, that Mr. Sheil has not demonstrated the existence of a genuine issue of material fact with regard to his performance review.

Mr. Sheil also fails to offer evidence to rebut Ms. Corder's explanations for why she removed certain employees from his supervision and certain tasks from his desk.  While Mr. Sheil asserts that these decisions were retaliatory, he offers no evidence beyond potential temporal proximity to rebut Defendant's non-retaliatory explanations.  (ECF No. 61.)  At this stage of the analysis, temporal proximity alone is not enough.  *DePaula*, 859 F.3d at 976.  The Court concludes, therefore, that Mr. Sheil has failed to raise a genuine issue of material fact regarding the reassignments of workload.

For the above discussed reasons, the Court concludes that Mr. Sheil has raised a genuine issue of material fact regarding possible retaliation as to his non-selection for the Colorado Springs position and as to the hostile conduct of the Regional Office towards him related to his supervision of C.C.  He has failed to do so with regard to the other allegations of retaliation.  Therefore, the Court will GRANT IN PART and DENY IN PART Defendant's Motion for Summary Judgment as to Mr. Sheil's third claim.

## IV.   CONCLUSION

Accordingly, for the reasons set forth herein, it is **ORDERED** that Defendant's Motion for Summary Judgment (ECF No. 42) is **GRANTED IN PART AND DENIED IN PART**:

(1) The Motion for Summary Judgment is GRANTED as to Mr. Sheil's first claim, for discrimination on the basis of gender, and fourth claim, for hostile work

environment, which claims are hereby dismissed; and

(2) The Motion for Summary Judgment is GRANTED IN PART DENIED IN PART

as to Mr. Sheil's second claim, for discrimination on the basis of race, and third

claim, for retaliation, as more fully set forth above.

DATED this 5th day of July, 2024.

BY THE COURT:

_____

RAYMOND P. MOORE
Senior United States District Judge